## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**JOHNNY RAY EVANS**                                                    **PLAINTIFF**
**ADC #120543**

**v.**                        **No: 4:20-cv-00290 LPR-PSH**


**ESTELLA BLAND**                                                      **DEFENDANT**


## PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Recommendation has been sent to United States District Judge
Lee P. Rudofsky.   You may file written objections to all or part of this
Recommendation.  If you do so, those objections must: (1) specifically explain the
factual and/or legal basis for your objection, and (2) be received by the Clerk of this
Court within fourteen (14) days of this Recommendation. By not objecting, you may
waive the right to appeal questions of fact.

## DISPOSITION

### I.  Introduction

Plaintiff Johnny Ray Evans, an inmate at the Arkansas Division of
Correction's Varner Unit, filed a complaint pursuant to 42 U.S.C. § 1983 on March
18, 2020 (Doc. No. 2) and an amended complaint on April 14, 2020 (Doc. No. 4).

Evans alleges that defendant Estella Bland was deliberately indifferent to his serious medical needs related to his prosthetic leg, diabetic medication, and pain medication. He also claims she violated his Fourteenth Amendment equal protection rights because other inmates were allowed to keep two or more assisted mobility devices while he was only allowed to keep a wheelchair.

On September 26, 2022, summary judgment was entered in Bland's favor on Evans' Eighth Amendment pain medication claim (Doc. No. 72). Evans' Eighth Amendment deliberate indifference claims regarding his prosthetic leg and diabetes medication and his Fourteenth Amendment Equal Protection claim remain pending (*id*). Evans was subsequently appointed counsel and deadlines were set to obtain expert testimony/opinions and conduct any related discovery (Doc. No. 73). On March 10, 2023, Bland moved for leave to file a second motion for summary judgment, citing Evans' failure to obtain an expert opinion and additional evidence the Court had not yet considered (Doc. No. 82). Bland's motion was granted, and deadlines were set for a second round of summary judgment motions (Doc. Nos. 87 & 88).

Now before the Court is a second motion for summary judgment, brief-in-support, and statement of facts filed by Bland (Doc. Nos. 89-91). Evans filed a response, brief-in-support, and statement of facts (Doc. Nos. 94-96). Bland filed a notice that statement of facts are deemed admitted (Doc. No. 97), a response to

Evans' statement of facts (Doc. No. 98), and a reply (Doc. No. 99).  For the reasons

set forth in this Recommendation, the undersigned recommends that Bland's motion

for summary judgment be granted.

## II.  Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is

proper if "the movant shows that there is no genuine dispute as to any material fact

and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986).  When ruling on a motion for

summary judgment, the court must view the evidence in a light most favorable to

the nonmoving party.  *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir.

2002).  The nonmoving party may not rely on allegations or denials, and must instead

demonstrate the existence of specific facts that create a genuine issue for trial.  *Mann*

*v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).  The nonmoving party's allegations

must be supported by sufficient probative evidence that would permit a finding in

his favor on more than mere speculation, conjecture, or fantasy.  *Id.* (citations

omitted).

An assertion that a fact cannot be disputed or is genuinely disputed must be

supported by materials in the record such as "depositions, documents, electronically

stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials

. . .".  Fed. R. Civ. P. 56(c)(1)(A).  A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case.  *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012).  Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment.  *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

In *Reed v. City of St. Charles, Mo.*, 561 F.3d 788 (8th Cir. 2009), the Eighth Circuit Court of Appeals discussed the requirement that facts be viewed in the light most favorable to the nonmoving party when considering a motion for summary judgment.  The Court stated, "[i]f 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them."  *Id.* at 790 (*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### III.  Complaint Allegations & Evidence[1]

Defendant Bland was at all relevant times an Advance Practice Registered Nurse ("APRN") at the Varner Unit of the Arkansas Division of Corrections ("ADC"). *Horan Affidavit 1* at 3.  Plaintiff Evans has been in the ADC since August 15, 2014. *Id.* at 2; *Evans Deposition* at 15.  He has been an insulin dependent diabetic patient for about 33 years. *Id.* at 10.  Evans' left leg was amputated below the knee prior to his current term of incarceration in relation to his diabetes diagnosis. *Id.* at 9-10.  He was provided a prosthetic leg by the ADC in 2014, which he had until an appointment with Bland on May 23, 2019. *Id.* at 17-20.  He also had a wheelchair during that time. *Id.*

Pending in this case are Evans' Eighth Amendment deliberate indifference claims based on Bland's care related to his prosthetic leg and diabetes medication. *Id.* at 69-71; Doc. No. 4.  He specifically alleges that Bland refused to provide him

---

[1] Defendants rely on the following documentary evidence in support of their motion for summary judgment:  Doc. No. 28-1, Evans' Relevant Medical Records ("*Medical Records 1*"); Doc. No. 28-2, Deposition Testimony of Johnny Ray Evans ("*Evans Deposition*"); Doc. No. 28-3, Affidavit of Chris Horan, M.D. ("*Horan Affidavit 1*"); Doc. No. 70-1, Doc. No. 28-1, Evans' Additional Relevant Medical Records ("*Medical Records 2*"); Doc. No. 70-2, Affidavit of Estella Bland ("*Bland Affidavit*"); Doc. No. 70-3, Affidavit of Chris Horan, M.D. ("*Horan Affidavit 2*"); and Doc. No. 91-1, Declaration of Dr. Gary R. Kerstein and attached medical records ("*Kerstein Declaration*").  Evans submitted:  Doc. No. 96-1, Affidavit of Johnny Ray Evans ("*Evans Affidavit*"); Doc. No. 96-2, Affidavit of David Taylor ("*Taylor Affidavit 1*"); Doc. No. 96-3, Affidavit of Daniel Strickland ("*Strickland Affidavit 1*"); Doc. No. 96-4, Affidavit of David Taylor ("*Taylor Affidavit 2*"); and Doc. No. 96-5, Affidavit of Daniel Strickland ("*Strickland Affidavit 2*").

with proper medical care at the Varner Unit on May 23, 2019, and October 1, 2019. Doc. No. 4; *Evans Deposition* at 19.  Evans also asserts that Bland violated his 14th Amendment equal protection rights.  The evidence submitted in connection to Evans' claims is described below.

### *Prosthetic Leg*

Evans' left leg was amputated December 18, 2013, before his most recent incarceration.  *Evans Deposition* at 17.  He testified that he was seen by an orthotist in Texarkana a number of times prior to his incarceration but did not receive a prosthetic leg at that time.  *Id.* at 17-18, 48-49.  Evans received a left prosthetic leg while incarcerated in 2014 and has been evaluated by an orthotist between four and six times since then.  *Id*. at 48-49.  He uses gel liners with his prosthetic leg to cushion the leg when wearing it.  *Id.* at 20-21, 29-30, 38.  Evans states that these liners wear out and need to be replaced once a year.  *Id.* at 29, 38.  He also claims the doctor who fitted him with the leg told him it would need to be refitted periodically as his leg shrinks.  *Id.* at 29, 38.  Evans' right fifth toe was also amputated in relation to his diabetes diagnosis.  *Id.* at 10, 71.  He testified that his right foot leans and is crooked or deformed due to an old fracture of his right leg. *Id.* at 20-21, 71-72.

Evans has no job assignment.  *Horan Affidavit 1* at 2; *Evans Deposition* at 15, 22-23.  Evans testified that from 2014 to May 23, 2019, he mostly used his

wheelchair for ambulation.  *Evans Deposition* at 20.  Although he spends most of his time lying in bed or sitting and watching television, he used his prosthetic leg a few hours each day for exercise when he had it.  *Evans Deposition* at 16, 20, 22, 24, 57.  When asked if he used his prosthetic leg to walk in prison between 2014 and May 23, 2019, Evans testified:

> I didn't walk.  Well, see, I walked every now and then, but I used my wheelchair mostly.  And then I'd walk with my leg in the barracks.  And every now and then I'd walk down the hall.  But, you know, unless I walk it every morning – I walked every morning for a couple of hours with my leg.  . . .

*Id.* at 20.  He also testified that he had walked to the infirmary to see Bland using his prosthetic leg and pushing his wheelchair.  *Id.* at 46-47.  Evans' testimony that he used his prosthetic leg for exercise is corroborated by affidavits from other inmates. *See* Doc. No. 53 at 22-23; *Taylor Affidavit 2; Strickland Affidavit 2*.

APRN Estella Bland examined Evans on May 23, 2019.  *Medical Records 1* at 2-3.  Evans claims he requested new gel liners and a refitting of his prosthesis at this visit.  *Evans Deposition* at 23, 27; Doc. Nos. 52, 52-1, 53 at 10.  Bland noted that there was no indication for double assistive devices and that she had never seen Evans use the prosthetic leg. *Medical Records 1* at 2-3.  She directed staff to retrieve his prosthetic leg and gel liners.  *Id.*  Bland also noted that Evans told her, "I am giving that leg back.  It is too big.  I tried to tell the guy that he was not doing it right. I don't want that damn thing. You can get it.  He would not get the gel liner right

anyway." *Id.* at 2.  Evans disputes that he said this.  *Evans Deposition* at 38; Doc.

No. 53 at 8.  He claims that a nurse told him Bland wanted him to choose between

the leg or the wheelchair.  *Evans Deposition* at 23.  He stated:

> And I told her – I said, I can't wear the leg.  I said, Because the gel
> sleeves is wore out.  They've got – they're still in the infirmary right
> now, and they're still wore out.  She still had never ordered those gel
> sleeves.  And when they did that, she told me Well, you've got to make
> the choice, either wheelchair or leg.  I said, Well, I can't wear the leg.
> So I guess I'm going to have to give you the leg, because I can't wear
> it.  You know, the gel sleeve is wore out.

*Id.* at 23-24.  Evans testified that Bland should have permitted him to keep his left

prosthetic leg (after obtaining new gel liners and a refitting) and a wheelchair for

ambulation.  *Id.* at 26-28.  He says other providers allowed him to have both a

prosthetic and a wheelchair, and other inmates, such as Ricky Hill, are allowed to

have both.  *Id.* at 27-28, 40-41.  Evans also testified that he inquired about a policy

allowing inmates to have only one assistive walking device and was told there is no

such policy.  *Id.* at 42.

Evans testified that he needs to use the prosthetic leg to walk but cannot use

it all the time.  He explained that the way his left leg amputation was performed

caused the bone to stick out sharply and rub the gel sleeve of the prosthetic leg.

*Evans Deposition* at 72-73, 20-21.  This rubbing causes blisters on his left leg stump

which take time to heal because of his diabetes.  *Id.*  Evans testified it normally takes

about three weeks for the blisters to heal and during that time he uses a wheelchair

for ambulation.  *Id.*  He testified that he does not get blisters when using his wheelchair.  *Id.* at 53.  Evans testified:

> . . . And as far as walking, I walk with my leg when I could.  And then where my leg got sore or like – the leg – the gel sleeves, when they wore out – like, they wore out whenever I come out the back.  And they had the holes in them, and they was rubbing blisters on my leg.  Okay, when a blister got on my leg, I couldn't wear the leg.  Because it would take two or three weeks for the blister to heal up.  That's when I really need the wheelchair.

*Id.* at 20-21.  He further testified:

> I just want the wheelchair and the leg, so I can – like I say, when my leg gets sore, I'll want – I need the wheelchair.  If I walk with the leg and I need the wheelchair to go from my bed to the shower, take a shower, you know, like I say, it's – if I get a blister on my leg, it's three weeks that I have to wait for the blister to heal up before I can wear my leg.  And that's why I need the wheelchair, just certain times like that.  I mean, it's certain things that you need the wheelchair instead of the leg.
>
> . . .
>
> And I wouldn't use the wheelchair all the time.  That's like right now.  With my leg bent the way it is, I don't know if I'm going to have to go through the rehab to get it straightened out to be able to walk again, just to be able to walk again.  I don't know what kind of rehab I've got to go through.  . . .

*Id.* at 70-71.

On October 1, 2019, Evans was to be examined by Bland again regarding his prosthetic leg.  *Medical Records 1* at 18.  Bland noted that Evans attempted to discuss the medical care provided to other inmates and that she dismissed Evans from the clinical encounter.  *Id.*  Evans claims that he told Bland other inmates were allowed

to have both wheelchairs and protheses, and Bland told him there was "not a chance in hell" he would get his leg back. *Evans Deposition* at 51-52.

Evans provided an affidavit regarding his desire for a prosthetic leg. *Evans Affidavit.* He claims that Dr. Iko allowed him to have both a prosthetic leg and wheelchair, but Bland made the decision to take away his prosthetic leg because she believed he did not use it. *Id.* at ¶¶ 12-14. He claims he used his prosthetic leg to get adequate exercise, which he cannot do in a wheelchair. *Id.* at ¶ 15. He also claims other inmates have both wheelchairs and prosthetics, but provides no specific information regarding those inmates. *Id.* at ¶ 16. Evans also provided affidavits from two other inmates who say they witnessed Evans use his prosthetic leg to exercise daily and have not seen him exercise since his leg was taken away. *See Taylor Affidavit 2* and *Strickland Affidavit 2.* These inmates also claim they have witnessed other unnamed inmates use both wheelchairs and prosthetic legs. *Id.*

In support of her motion for summary judgment, Bland submitted an affidavit. In her affidavit, she explained that in May and June 2019, she was "concerned that Mr. Evans would develop non-healing sores on his stump which could ultimately lead to sepsis, further amputation and even death." *Bland Affidavit* at 2. She claims that she "was attempting to reason with Mr. Evans that ambulating by wheelchair was in his best interests and have him choose the better option for his

health at those encounters." *Id.*  Bland stated that "off-loading Mr. Evans' stump was appropriate medical care." *Id.*

Bland also submitted another affidavit by Dr. Chris Horan in addition to the one he previously provided.[2]  Dr. Horan opined that Bland provided Evans with appropriate care and treatment for his complaints on May 23, 2019, and October 1, 2019. *Horan Affidavit 1* at 4-5.  He noted that Evans acknowledges that he uses his wheelchair for ambulation most of the time, regardless of whether he has the prosthetic leg available to him. *Id.* at 4.  Dr. Horan also noted that Evans has difficulties using his prosthetic leg because it causes blisters and he has a deformity in his right foot. *Id.* at 4.  In Dr. Horan's medical opinion, ambulation by wheelchair is in Evans' best interests so that he does not put weight on his right foot and does not incur non-healing wounds to his left leg stump or right foot. *Id.*  He concurred with Bland's decision to "off-load" Evans' stump due to the risk of blisters and non-healing wounds worsened by diabetes. *Horan Affidavit 2* at 3.  In his second affidavit, Dr. Horan further opined:

> It is my opinion that Plaintiff is able to sufficiently exercise even though he ambulates by wheelchair.  First, ambulation by wheelchair is in his best medical interests as opposed to ambulation via a prosthesis for the above-stated reasons.  Secondly, many athletes ambulate via wheelchair, to include professional-level events including basketball and marathons.  Plaintiff has the ability to use his wheelchair at the

---

[2] Dr. Horan states that his opinions are consistent with sound medical practices and his professional judgment and are stated to a reasonable degree of medical certainty. *Horan Affidavit 1* at 5; *Horan Affidavit 2* at 4.

track during yard call.  Plaintiff can also use his arms to do any number of exercises, including pull-ups, push-ups and dips.  If Plaintiff would perform these exercises, his diabetes would be under better control.

*Id.*

### Diabetes Medication

Evans claims that Bland did not appropriately treat his diabetes because she changed his prescription for Lantus to 70/30 insulin instead.  *Amended Complaint* at 7.  In his deposition, he testified that Bland should have given him "Humulin" insulin. *Evans Deposition* at 63-65, 70-71.  He stated:

> Well, when I was on Humulin insulin, my sugar was better controlled.  It was half of what it is now, half of what it was – you know, half of what it's been.  But when she put me back on 70/30 – and she asked me that day. She said, What are you doing on Humulin insulin? She said, Ain't nobody on Humulin insulin.
>
> I said, Well, when Dr. Stuckey was here, which was a doctor, Dr. Stuckey put – I said I was on 70/30.  He kept raising it up, raising it up. And then he told me – he said,  Well, some people just got to be on a different kind of insulin.  And then he made the decision to put me on Humulin 30.  Okay, and then he left.  When he left – when Bland come in there, Bland asked me.  They were trying to switch everybody over to 70/30, because we all know it's the cheapest insulin you can buy. Humulin insulin is high.
>
> And then when she – I told her.  I said, Well, Dr. Stuckey done it.  Okay, and then she made a decision to change Humulin insulin to 70/30.  . . .

*Id.* at 63.

Evans clarified in his statement of facts and responses that he had been put on Lantus, not Humulin, by Dr. Stuckey in August 2017.[3] Doc. No. 52-1 at 3; Doc. No. 53 at 12. He contends that Bland asked why he was taking Lantus during a sick call, and a few months later, a nurse told him Bland changed his insulin to 70/30. *See* Doc. No. 52-1 at 3. Bland made this change on December 12, 2018. *Medical Records 2* at 1-2; *Bland Affidavit* at 1. She noted that Evans was "informed that his hgba1c is currently 9.2% on his insulin of choice – which indicates poor control." *Id.* at 2. She explained in her affidavit that she made this decision to try a new approach to getting Evans' blood sugar levels under control. *Bland Affidavit* at 2.

Evans testified that his A1C levels were too high while on Humulin 70/30, running between 9 and 12, when they should be under 7. *Evans Deposition* at 43. Regarding Bland's treatment of his diabetes, Evans testified:

> . . . For the last – every three months I go to get blood work done. Okay, my sugar has been running three to four five almost every day. And when I go to get my blood work done – and every time I get a thing that says there's – everything is perfectly fine. There's no need for you to be – causes me to see you or nothing.
>
> Okay, my sugar is – like, if my A1C is nine, ten, 11, or 12, there's a problem there. We need to get together and discuss it. But to her, she said there's not no problem. But there's a problem there. If my sugar is running that high, it's a problem. And the she told me that I needed to eat what they serve me in the kitchen. What am I going to eat?

---

[3] It appears that Evans was confused about the name of the insulin he had been taking and was referring to Lantus instead of Humulin during his deposition; his medical records show that he was on Humulin 70/30 from December 12, 2018, through at least October 29, 2019. *See Medical Records 2* at 1; *Medical Records 1* at 2-25.

> I go in the kitchen.  I get a diet tray.  The diet tray consists of noodles, rice, you know, stuff that brings your sugar up, bread.  You know, you've got a diet tray in there.  You know what?  A diet tray is the same tray as a regular tray but with no salt and pepper.  That's it.  That's what a diet – that's what it consists of.

*Id.* at 61.

During Evans' May 23, 2019 encounter with Bland, Bland noted that Evans had elevated blood sugars and was not compliant with his diet.  *Medical Records 1* at 2-3.  She increased Evans' Humulin 70/30 doses in the morning and in the evening to address the elevated blood sugars.  *Id.*  Bland noted, "[Evans] was informed of his change in insulin dose – he was encouraged to monitor his dietary habits for optimal blood sugars."  *Id.* at 3.

Evans saw Dr. Aaron Smith on June 3, 2019, who noted "encourage compliance and improved diet w/exercise."  *Id.* at 4.  On June 23, 2019, a nurse recorded that Evans came to the pill window for diabetic call.  *Id.* at 6.  She noted his blood sugar was 599, he was given Humulin 70/30, and Bland was given a report.  *Id.*  She further noted, "No new orders.  Continue teaching on diet, exercise and medication as prescribed."  *Id.*

On July 3, 2019, Dr. Smith noted an improvement in Evans' blood glucose with no other details.  *Id.* at 7.  On July 22, 2019, a nurse noted that Evans' blood sugar was 595 and Bland gave a verbal order on the telephone to give him 15 units of insulin and recheck in one hour.  *Id.* at 9.  An hour later, his blood sugar was 528;

Bland ordered he receive an additional 15 units of regular insulin, be rechecked in one hour, and be kept in the infirmary. *Id.* Approximately an hour later, his blood sugar was 309, and no additional insulin was administered. *Id.* Evans was informed not to eat foods high in sugar/starch. *Id.*

On August 9, 2019, a nurse reviewed recent lab work with Evans. *Id.* at 11. His Hemoglobin A1C taken on July 10, 2019, was 9.8%. *Id.* Later that day, Evans was brought to the infirmary because he was not feeling well. *Id.* at 12. The nurse noted that he said, "Everytime I lay down I start shaking. I don't know whats wrong with me. I think my sugar is high." *Id.* His blood sugar was 541; Bland gave verbal order for 15 units of R insulin, and for Evans to be rechecked in one hour and blood sugar monitored until within normal parameters. *Id.* There is no record of what his blood sugar was on subsequent checks.

On September 28, 2019, a nurse was called to Evans' barracks due to possible seizure activity. *Medical Records 1* at 17. She noted that Evans was lying in bed awake, but unable to verbally respond to medical. *Id.* He was transferred to a stretcher and taken to the infirmary at 7:40 a.m., where he was noted as being sluggish and disoriented. *Id.* His blood sugar was 33, and he was given glucose gel. *Id.* His blood sugar was then taken several times between 8 a.m. and 8:40 a.m., with readings under 51. *Id.* Evans was given additional glucose. *Id.* Bland, Dr. Smith, and Parker were called. *Id.* Bland ordered that Evans be kept in the infirmary and

monitored.  At 9:55 a.m., his blood sugar was 84.  *Id.*  At 10:35, Evans requested to return to his barracks; Bland approved his request and stated he should be placed on the provider list to discuss diabetic concerns.  *Id.*

On October 3, 2019, Evans had another hypoglycemic event.  *Medical Records 1* at 19.  The responding nurse reported that he was lying down, sweating profusely, moaning, and groaning at 7:55 a.m.  *Id.*  He was placed on a stretcher and taken to the infirmary.  *Id.*  His blood sugar was 27.  *Id.*  He was given glucose gel and Bland arrived to assess him.  *Id.*  She ordered Narcan and a Dextrose injection. *Id.*  By 9:45 a.m., Evans' blood sugar was up to 151, and he was released to his barracks soon after.  *Id.* at 20.

On October 10, 2019, Evans received a prescription for Pioglitazone.  On October 29, 2019, Evans was seen by Dr. Gary Kerstein for a medical renewal. *Medical Records 1* at 25.  Dr. Kerstein noted that Evans stated "he used to take 100u Lantus bid in world but one year ago med records show 55u bid 7/10/19 HgA1c=9.8."  *Id.*  Dr. Kerstein noted that Evans' diabetes was poorly controlled, that he was insulin compliant, and questioned his diet compliance. *Id.* Dr. Kerstein renewed Evans' 70/30 Humulin prescription, prescribed an ointment for Evans' leg stump, and ordered an A1C test.  *Id.*

On November 21, 2019, a nurse was called to Evans' barracks at approximately 10 a.m. because he was unresponsive.  *Medical Records 1* at 29.  He

was taken to the infirmary where his blood sugar measured 32. *Id.* He received a glucagon injection and glucose gel. *Id.* He was given a 60-ounce Coke after he became alert and oriented, and his blood sugar was at 56. *Id.* He was released to chow at 11:30 a.m. *Id.* Evans' A1C value was 9.3% on November 26, 2019. *Medical Records 2* at 7.

On December 27, 2019, a nurse was called to Evans' barracks because he was unresponsive. *Medical Records 1* at 34. He was given a glucagon injection at 9:15 a.m.; at 10:39 a.m., his blood sugar was at 61, and he had stopped sweating and was sitting up on side of stretcher. *Id.* On December 31, 2019, Dr. Smith examined Evans and noted that his A1C was 9.2, that he was "stable improving no gabapentin indicated with uncontrolled A1C at this time." *Id.* at 35. Evans' A1C value was 9.5% on January 17, 2020. *Medical Records 2* at 10.

Evans provided an affidavit regarding the change to his insulin medication and his uncontrolled blood sugar. *Evans Affidavit.* Evans states that Bland changed his diabetes medication on May 23, 2019. *Id.* at ¶ 7. Again, his medical records show this change was made several months before on December 12, 2018. *See Medical Records 2* at 1-2. Evans claims that this change caused his blood sugar to fluctuate throughout the day and led to a number of hypoglycemic and hyperglycemic events and uncontrolled AIC levels. *Id.* at ¶¶ 3-7. He claims that he made Bland aware of these issues on numerous occasions in 2019, as described

above, but his medication was not changed. *Id.* at ¶¶ 8 & 10. Evans also provided affidavits from two other inmates who say they witnessed Evans experience emergency situations where he was unresponsive, shaking, sweating, and unable to speak or sit up following the change in his diabetic medication. *See Taylor Affidavit 1* and *Strickland Affidavit 1.* These inmates say they also witnessed Evans with above average blood sugars that caused him to be lethargic, nauseous, and have intolerable headaches. *Id.*

Dr. Horan opined that Evans was provided with appropriate medical care regarding his insulin. *Horan Affidavit 1* at 3; *Horan Affidavit 2* at 3. He explains that it is common for adjustments to be made to the insulin dose to meet the needs of a diabetic patient. *Id.* at 3. According to Dr. Horan, there are a number of types of insulin used to treat diabetic patients, with the major difference in those types being the half-life of the medication. *Id.* R type insulin has a half-life of approximately 3 to 4 hours. *Id.* at 3. N type insulin has a half-life of approximately 6-7 hours. *Id.* at 3. 70/30 insulin consists of 70 percent R type insulin and 30 percent N type insulin. *Id.* at 3. Dr. Horan states that 70/30 is the standard insulin used in the prison setting and is normally prescribed to be administered twice per day. *Id.* at 3. In Evans' case, he was prescribed Humulin 70/30 insulin and he was provided Humulin R-type insulin as needed. *Id.* at 4; *Medical Records 1* at 2, 6, 9, 12, 16, 17. Dr. Horan stated that these sorts of adjustments are necessary and appropriate based

upon the blood glucose values presented and the other medical factors related to this patient. *Horan Affidavit 1* at 4.

In his second affidavit, Dr. Horan further opined:

Ms. Bland discontinued a prescription for Lantus (a form of insulin) to treat Plaintiff' diabetes on December 12, 2018. The lab values that Ms. Bland reviewed with Plaintiff on December 12, 2018, indicate that his hemoglobin A1C value was 9.2% while Evans was being treated with Lantus (demonstrating poor control). At that time, Ms. Bland prescribed Humulin insulin as a different approach in attempting to get Plaintiff' blood sugar values under better control. Lantus is a basal insulin which is usually prescribed as one injection per day and then adjustments are made after meals with additional insulin as needed. Humulin insulin is a totally different approach to diabetes management. Humulin is usually prescribed twice per day and provides broad coverage for a twenty-four-hour period. Humulin is preferred in the prison setting because the meal schedule is non-traditional and can be varied. It is my opinion that Ms. Bland's decision to switch Plaintiff' insulin from Lantus to Humulin was appropriate in light of Plaintiff' poor diabetes control while he was using Lantus.

*Horan Affidavit 2* at 2-3.

Bland also submitted a declaration by Dr. Gary Kerstein describing the history of Evans' diabetic treatment and his opinion regarding Bland's treatment decisions in May and October 2019.[4] *Kerstein Declaration.* He based his opinions on his review of Evans' medical records, the two affidavits provided by Dr. Horan, Bland's affidavit, and his education, training, and experience. *Id.* at 1.

---

[4] Dr. Kerstein states that his opinions are consistent with sound medical practices and his professional judgment and are stated to a reasonable degree of medical certainty. *Kerstein Declaration* at 2.

Dr. Kerstein explained that if a diabetic patient is managed with insulin, they are monitored with daily blood sugar tests and periodic hemoglobin A1c (A1c) tests. Insulin is adjusted as needed in conjunction with those test results.  Patients on oral diabetic medications are monitored only with A1c tests.  Most diabetic patients managed with insulin can be controlled using Humulin 70/30 which is a long-acting insulin given twice a day.  *Id.* at 1-2.

According to Dr. Kerstein, Evans' history shows that, prior to 2019, he had been prescribed Lantus alone or in combination with Humulin 70/30 (Humulin) since 2014.  Evans was originally started on Lantus in August 2014.  *Id.* at 2-3. Humulin was then added to the regimen in December 2014.  *Id.* at 2, 4.  Lantus and Humulin continued into 2015.  *Id.* at 2-5.  Evans was changed back to Lantus alone in October 2016.  *Id.* at 2, 8-9.  Over the course of the next two years, different combinations of this medicine were tried and, despite that, his hemoglobin A1c remained above 9 on a consistent basis.  *Id.* at 2, 16, 26-30.  Evans' hemoglobin A1c was 9.2 in January 2018, 9.6 in June 2018, 9.8 in July 2018, and 9.2 in December 2018.  *Id.*  Dr. Kerstein opined that, because Evans' diabetes was still not controlled, it was "absolutely appropriate" for Bland to discontinue the Lantus and to try and control Evans' diabetes with Humulin 70/30 twice a day since Humulin alone had yet to be tried.  *Id.* at 2.  Dr. Kerstein saw neither (1) evidence of any breach of a standard of care nor (2) any level of indifference toward Evans' diabetic care on the

20

part of Bland. *Id.* at 2.  In Dr. Kerstein's medical opinion, Bland made appropriate diabetic medication decisions within the standard of care in her efforts to treat Evans' diabetic condition in 2019, and specifically on May 23, 2019, and October 1, 2019. *Id.* at 2.

## IV.  Analysis

### A.  *Eighth Amendment Deliberate Indifference Claims*

The Eighth Amendment's proscription of cruel and unusual punishment obligates prison officials to provide adequate medical care to inmates in their custody.  *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976).  To succeed with an inadequate medical care claim, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs.  *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997). This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it.  *Id.; see also Farmer v. Brennan,* 511 U.S. at 837; *Estelle v. Gamble,* 429 U.S. 97, 105 (1976).  "Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are questions of fact."  *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011).  A serious medical need is defined as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's

attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). Additionally, the Eighth Circuit has held that a "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

**Prosthetic Leg.** In my last recommendation, I found there was an issue of fact as to whether Evans had a serious medical need for a prosthetic leg. *See* Doc. No. 65. I noted that there was no dispute that a physician previously determined that Evans should have a prosthetic leg in 2014 and that Evans was provided with both the prosthetic leg and wheelchair from 2014 until May 2019, indicating that Evans had a medical need for a prosthetic leg. In May 2019, Evans requested new gel sleeves and a refitting of his prothesis, but instead of providing these things, Bland informed Evans that he must choose between the leg and the wheelchair.

On the prior record for summary judgment, there was no explanation as to why Bland took away the prosthetic leg. Bland has since provided an affidavit explaining that she was concerned Evans would develop non-healing sores on his stump which could ultimately lead to sepsis and even death. She therefore decided to remove the prosthetic leg, forcing Evans to use the wheelchair to ambulate. According to Dr. Horan, Bland's decision to "off-load" Evans' stump was an appropriate medical decision given that Evans has poor diabetes control, a history of

non-healing blisters, and other issues making it difficult to fit a prosthetic leg.  Dr. Horan specifically opined that the risk of non-healing blisters outweighed the benefit of ambulating on a prosthetic leg.   Dr. Horan further opined that Evans could sufficiently exercise in his wheelchair and should do so in order to better control his diabetes.

In response, Evans has not come forward with any expert opinion or other evidence showing that he is unable to exercise sufficiently in a wheelchair or that he has a serious medical need for a prosthetic leg at this time and in light of his other medical issues.[5]  In light of the additional evidence provided by Bland, and Evans' failure to come forward with any additional evidence to support his claims (other than the observation from other inmates that he exercised with a prosthetic leg but stopped when it was taken away), there is no issue for trial.  Bland's decision to take away Evans' prosthetic leg does not evidence deliberate indifference to Evans' serious medical needs, and she should be granted summary judgment on this claim.

***Diabetes Medication.***  The additional evidence supplied by Bland also shows that she was not deliberately indifferent to Evans' serious medical needs when she changed his diabetes medication in 2018.  It is undisputed that Evans' diabetes is poorly controlled.  Evans insists that he it was better controlled with Lantus, his

---

[5] Evans was appointed counsel who could seek expert testimony on his behalf, but has not offered such testimony. *See* Doc. No. 73.

previous medication.  However, the additional medical records provided show that his diabetes was poorly controlled with Lantus too; while it has not improved on Humulin, it has not significantly worsened either.  Evans argues that his A1C levels have increased on Humulin, from 9.2 to as much as 9.8.  Yet, this is not a significant difference – the levels fluctuated from 9.2 to 9.8 to 9.3 to 9.5 in 2019; Evans' A1C levels also fluctuated between 9 and 10 while he was on Lantus in 2018.  *See Kerstein Affidavit* at 2.  All reflect poorly controlled diabetes, indicating that medication alone is not what is causing Evans to experience fluctuating blood sugar and hypoglycemic or hyperglycemic events.  *Id.*  Both Drs. Horan and Kerstein opine that Bland's decision to try Humulin alone was medically appropriate.  Evans has come forward with no evidence to controvert their opinions.  The evidence does not support a finding that Bland was deliberately indifferent to Evans' serious medical needs.  Accordingly, Bland is entitled to summary judgment on Evans' diabetes medication claim.

**B.**     ***Fourteenth Amendment Equal Protection Claim.***

Pursuant to the Equal Protection Clause of the Fourteenth Amendment, "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, §1. The Equal Protection Clause has been interpreted to require that "all persons similarly situated should be treated alike*." City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985).

Evans argues that his right to equal protection has been violated because other inmates have both prosthetic legs and wheelchairs.  He does not allege that he is a member of a protected class or that he was denied a fundamental right.[6] Accordingly, he is considered a "class-of-one" plaintiff and must show that he was "'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'"  *See Nolan v. Thompson,* 521 F.3d 989 (8th Cir. 2008) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  A class-of-one plaintiff must "provide a *specific and detailed* account of the nature of the preferred treatment of the favored class," especially when the state actors exercise broad discretion to balance a number of legitimate considerations. *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214-15 (10th Cir. 2004) (emphasis added).

Bland argues that Evans is a very specific class of one; he has had diabetes for over 30 years, has an amputated leg, an amputated toe, and a deformed right foot. Evans acknowledged that he gets blisters when using a prosthetic leg and that it takes several weeks for those blisters to heal.  Bland argues she must use her medical

---

[6] Fundamental rights are those expressly mentioned in the Constitution or those rights implicitly protected by the Constitution such as the right to privacy, *Griswold v. Connecticut*, 381 U.S. 479 (1965), the right to vote, *Harper v. Virginia Board of Education*, 383 U.S. 663 (1966), the right to travel interstate, *Shapiro v. Thompson*, 394 U.S. 618 (1969), and the right to marry, *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).

judgment to determine what is appropriate for Evans, and what is appropriate for other inmates may not be appropriate for Evans.  Bland is correct that Evans must identify similarly situated inmates who have the same medical issues he has in order to bring a viable equal protection claim.  *See e.g., Hansen v. Rimel*, 104 F.3d 189, 190 (8th Cir. 1997).  He has not done so.  Evans submitted affidavits from two inmates who claim they have seen other inmates use both wheelchairs and prosthetic legs.  They did not identify any of the inmates by name or otherwise describe them.  There is no evidence these inmates suffer from poorly controlled diabetes, unhealing blisters, or the other deformities that Evans has.  Because Evans has come forward with no evidence that he has been treated differently than similarly situated inmates, his equal protection claim fails, and Bland should be awarded summary judgment.

## V.   Conclusion

The undersigned therefore recommends that Bland's motion for summary judgment (Doc. No. 89) be granted.  Judgment should be entered in Bland's favor on Evans' Eighth Amendment deliberate indifference claims regarding his prosthetic leg and diabetes medication and his 14th Amendment equal protection claim.

SO RECOMMENDED this 15th day of June, 2023.

_____
UNITED STATES MAGISTRATE JUDGE